IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERICA M. ZERBE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 3:12-cv-01831 |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | Hon. John E. Jones III |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

### June 26, 2014

## Introduction

Plaintiff Erica M. Zerbe has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Zerbe's claim for social security disability insurance benefits and supplemental security income benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  Zerbe met the insured

status requirements of the Social Security Act through December 31, 2014.  Tr. 13.[1]

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Zerbe protectively filed her applications for disability insurance benefits on August 14, 2009, alleging that she became disabled on July 17, 2009.  Tr. 91, 93. Zerbe has been diagnosed with several impairments, including degenerative disc disease and disc bulging in her lumbar, thoracic, and cervical spine, sleep apnea, depression, a methicillin-resistant Staphylococcus aureus ("MRSA") infection, a herniated disc with spinal cord compression, insomnia, hypersomnia, and obesity. Tr. 14, 515, 620.  On November 16, 2009, Zerbe's applications were initially denied by the Bureau of Disability Determination. Tr. 53, 58.

A hearing was conducted by an administrative law judge ("ALJ") on January 11, 2011, where Zerbe was represented by counsel.  Tr. 27-49.   On January 26, 2001, the ALJ issued a decision denying Zerbe's application.  Tr. 11-20.  On July 24, 2012, the Appeals Council declined to grant review.  Tr. 1.  Zerbe filed a

---

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

complaint before this Court on September 9, 2012.  Supporting and opposing briefs were submitted and this case became ripe for disposition on March 12, 2013 when Zerbe filed a reply brief.

Zerbe appeals the ALJ's determination on three grounds: (1) the ALJ did not properly evaluate the opinion evidence of record, (2) the ALJ failed to evaluate third party statements, and (3) the ALJ did not properly determine Zerbe's residual functional capacity.  For the reasons set forth below, the case is remanded to the Commissioner for further proceedings.

## Statement of Relevant Facts

Zerbe is 31 years of age, obtained her GED, and is able to read, write, speak and understand the English language.  Tr.  30, 115.  Zerbe's past relevant work included work as a Sergeant in a correctional facility, classified as medium, semiskilled work; as a fast food worker, classified as light, unskilled work; she also held a retail sales position, which is classified as light, semiskilled work.  Tr. 42.

### A.    Zerbe's Mental Impairments

The first documentation within the administrative record referencing Zerbe's mental impairments occurred on February 14, 2008 when Zerbe presented to her primary care physician, Gary Kemberling, D.O., complaining of anxiety.  Tr. 485. Dr. Kemberling noted that Zerbe had been on Paxil, Lexapro, Zoloft, and Effexor in the past; none of those medications had been effective in easing Zerbe's anxiety.

Id. Dr. Kemberling also noted that Zerbe stopped taking Trazadone because it caused drowsiness. Id. Dr. Kemberling noted that Zerbe had "no interest," diminished energy, and increased agitation at times. Id. Dr. Kemberling also observed that Zerbe had "[p]oor insight into [the] cause" of her anxiety and depression. Id. Dr. Kemberling recommended a psychological referral for Zerbe, but she did not want psychological counseling at that time. Id.

On October 8, 2008, Zerbe was experiencing depression and asked Dr. Kemberling for a prescription for Paxil. Tr. 483. On February 26, 2009, Zerbe returned to Dr. Kemberling, complaining that she was "[s]till having depression symptoms." Tr. 231. Dr. Kemberling reiterated his diagnosis of adjustment disorder with a depressed mood and prescribed Paroxetine. Id. At a follow-up appointment on March 31, 2009, Zerbe noted that she was not sleeping well, was agitated, and had a short temper. Tr. 236. Zerbe also complained that Paxil (Paroxentine) was "not working." Tr. 239. Dr. Kemberling prescribed Cymbalta to treat Zerbe's depression. Tr. 236.

On April 15, 2009, Dr. Kemberling diagnosed Zerbe with depressive disorder, and prescribed her Seroquel. Tr. 243.[2] On May 9, 2009, Zerbe presented to Dr. Kemberling complaining of "extreme anxiety." Tr. 241. Dr. Kemberling diagnosed Zerbe with acute stress and prescribed Lorazepam as needed to ease the

---

[2] The records for this appointment are not contained within the administrative record. The only evidence of this appointment comes from the May 9, 2009 appointment records.

anxiety.  Id.  On August 5, 2009, Zerbe returned to Dr. Kemberling, again

complaining of acute stress; Dr. Kemberling continued her on Lorazepam.  Tr.

270.  In November 2009, Zerbe had three sessions with Donna Pinter, Ph.D. under

her employee assistance program ("EAP").  Tr. 588.  Dr. Pinter noted that she had

discussed stress reduction with Zerbe at these appointments, but due to the nature

of EAP sessions, she was unable to delve into Zerbe's problems in depth.  Id.

On December 29, 2009, Dr. Kemberling completed a mental residual

functional capacity assessment of Zerbe.  Tr. 658-59.  Dr. Kemberling reiterated a

diagnosis of depression, and noted that Zerbe suffered from feelings of

hopelessness and worthlessness, decreased energy, tearfulness, agitation and

irritability, frustration, low self-esteem, as well as sleep and appetite changes.  Tr.

659.  Dr. Kemberling opined that Zerbe had mild limitations in her ability to

maintain attention and concentration during an eight-hour workday.  Tr. 658.  Dr.

Kemberling also believed that Zerbe had moderate limitations in her ability to

perform tasks and activities within a schedule, marked limitations in her ability to

fulfill quota or production requirements, and extreme limitations in her ability to

complete a normal workday or workweek.  Id.  Finally, Dr. Kemberling opined that

Zerbe's impairment would, on average, likely cause her to be absent from work

more than two days per month.  Tr. 659.  Otherwise, Dr. Kemberling did not

believe that Zerbe's mental impairment limited her in any other way.  Tr. 658.

### B.    Zerbe's Physical Impairments

Zerbe injured her back in early 2008 after slipping and falling on ice.  Tr. 257.  On February 14, 2008, Dr. Kemberling prescribed Zerbe Cyclobenzaprine to ease Zerbe's back pain; Dr. Kemberling advised that this medication would cause drowsiness and therefore could only be taken at bedtime.  Tr. 485.  Zerbe's back pain continued throughout 2008, and in December of 2008, Zerbe complained that the pain was spreading to both of her legs.  Tr. 481, 483.

On January 5, 2009, an MRI scan was performed on Zerbe's lumber spine. Tr. 173.  This MRI revealed a mild diffuse disc bulge at the L3-4 and L4-5 level, as well as a "broad-based small central disc protrusion" and probable annular tear[3] at the L4-5 level.  Id.  The MRI also revealed a broad-based, moderate-sized central to left paracentral disc protrusion at the L5-S1 level, with a mild underlying diffuse disc bulge.  Id.  The MRI also showed mild left neural foraminal stenosis[4] at the L5-S1 level.  Id.

---

[3] "Annular tear symptoms can arise when the annulus fibrosus (the tough exterior) of an intervertebral disc rips. The outer layers of the annulus fibrosus near the vertebral endplates are replete with nerve fibers that are very sensitive to pain. These nerve fibers tend to react very strongly when they come into contact with the nucleus pulposus (the soft inner core of the disc), causing many patients to experience discomfort and a number of other symptoms of an annular tear." Laser Spine Institute, Annular Tear – Symptoms and Causes, by Mark Flood, D.O., *available at* http://www.laserspineinstitute.com/back_problems/annular_tear/symptoms (last visited June 23, 2014).

[4] "Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine." Mayoclinic.com, Spinal Stenosis Definition, *available at* http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last visited June 24, 2014).

Zerbe continued to suffer from back pain,[5] and Dr. Kemberling eventually referred Zerbe to Kevin McGaharan, M.D., for an evaluation.  Tr. 221.  Zerbe reported pain in her lower back that rain down to her buttocks and legs.  Tr. 222.  She also reported that she had attended physical therapy after her initial injury in 2008, and though the therapy did benefit Zerbe's upper back, it was "too painful" for her to complete.  Id.  Dr. McGaharan did not find any loss of sensation or weakness, found 5/5 strength throughout, and noted that Zerbe's reflexes and pin sensations were intact.  Tr. 222-23.  Zerbe had a normal gait, although she experienced pain in both her right and left legs during the straight leg test and her spinal flexion and extension range of motion were reduced.  Tr. 224.  At that point in time, Dr. McGaharan opined that Zerbe could continue working as a corrections officer.  Tr. 226.

Following Dr. McGaharan's advice, Zerbe began physical therapy at Healthsouth Physical Therapy on February 5, 2009.  Tr. 558.  At the initial session, Zerbe was diagnosed with degenerative disc disease and radiculopathy.[6]  Id.  Zerbe was discharged from physical therapy on February 25, 2009 after achieving

---

[5] On January 30, 2009, tests revealed that Zerbe had an MRSA infection.  Tr. 214.

[6] "Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. The nerve roots exit through holes (foramen) in the bone of spine on the left and the right. Radiculopathy can be the result of a disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes)." Shiner v. Colvin, 3:12-CV-01683, 2014 WL 1767126, at n.28 (M.D. Pa. May 2, 2014) (citation omitted).

minimal results.  Tr. 557.  It was noted that there was "doubtful compliance" with Zerbe's home exercise program.  Id.[7]

On May 30, 2009, Zerbe returned to Dr. Kemberling, complaining that she had exacerbated her back pain during a "scuffle" with an inmate at work.  Tr. 246. While Zerbe was experiencing mild to moderate spasms and tenderness of the paralumber muscles, she was not experiencing any CVA tenderness, and her straight leg tests were negative for pain.  Id.  On June 25, 2009, Zerbe returned to Dr. Kemberling, complaining of "very debilitating" back pain from which Percocet provided "[n]o relief."  Tr. 251.  Zerbe was diagnosed with lumbar disc displacement; Ms-Contin and Ketorolac Thromethamin were prescribed for her pain.  Id.

On July 23, 2009, Zerbe presented to Shaik Mohd Ahmed, M.D. for a caudal epidural steroid injection intended to alleviate Zerbe's back pain.  Tr. 256.  At that appointment, Zerbe complained of constant back pain that occasionally spread to her right lower extremity.  Tr. 257.  The pain was associated with lower extremity numbness, tingling, and weakness.  Id.  She reported that mediation reduced her pain by forty percent.  Id.  Zerbe was negative for pain in her hips and had 5/5 strength throughout; however, she was experiencing tenderness in her parasacral, central sacral, and central lumbar regions.  Tr. 260.  Zerbe's range of motion was

_____

[7] Zerbe also attended physical therapy in July of 2009, where she experienced better results.  Tr. 554-56.

in her lumbar spine was reduced, and she experienced pain with her flexion and extension range of motion.  Tr. 260.

An August 5, 2009 MRI of Zerbe's lumbar spine did not reveal any significant changes from the January 2009 MRI scan.  Tr. 176.  An August 10, 2009 MRI of Zerbe's thoracic spine revealed mild to moderate degenerative disc disease at the T6-7, T8-9, and T9-10 levels.  Tr. 177.  The MRI also showed a moderate disc protrusion at the T6-7 level which produced "mild flattening of the right ventral aspect of the spinal cord."  Id.  At the T9-10 level, the MRI revealed a small disc protrusion that did not encroach on the spinal cord.  Id.  On September 16, 2009, a CAT scan of Zerbe's lumbar spine revealed disc space narrowing at the L5-S1 level.  Tr. 184.

On August 19, 2009, Zerbe returned to Dr. McGaharan for a follow-up appointment.  Tr. 278.  Dr. McGaharan noted that, since his last meeting with Zerbe, she had embarked on a "conservative management course" of physical therapy, and epidural injections, "neither of which were helpful in reducing her pain."  Id.  Dr. McGaharan noted that Zerbe's straight leg tests were negative, although they did create pain in her back.  Tr. 279.  Zerbe had 5/5 strength throughout, a reciprocal gait that was not antalgic, and a guarded transition from sitting to standing.  Id.  Zerbe also had slightly diminished pin sensation in her left foot.  Id.  Dr. McGaharan believed that surgery may be an option for Zerbe since

other measures had failed, and referred Zerbe to David Andreychik, M.D. for surgical evaluation.  Id.

In late August and early September 2009, Zerbe presented to emergency rooms and medical centers multiple times complaining of severe back pain.  Tr. 178, 182, 270, 284, 496, 505, 508, 511, 514, 517, 519, 592.  At an August 30, 2009 emergency room visit, two doctors, Christopher Wilson, M.D. and Kristy Follmer, M.D., diagnosed Zerbe with a herniated disc and spinal cord compression.  Tr. 512. On August 31, 2009, Timothy Vollmer, M.D. and Lindsey Myers, M.D. reiterated this diagnosis.  Tr. 515.[8]

On September 2, 2009, Zerbe returned to the emergency room with back pain, radicular pain, and leg weakness.  Tr. 508.  During this visit, Zerbe seemed to be "sleepy" "and kept falling asleep" while the medical staff was speaking with her.  Tr. 509.  Dr. Follmer and Dr. Myers again diagnosed Zerbe with a herniated disc and spinal cord compression.  Id.  On September 6, 2009, Zerbe awoke with incontinence of urine and an unusual amount of back pain.  Tr. 496.  At the emergency room, Linette Archer, M.D. and Shaun Black, D.O. reiterated a

---

[8] At this emergency room visit, Zerbe complained that the pain was so severe she was unable to function at home.  Tr. 515.  Zerbe also complained that her medications took the "edge off" of her pain, but it was not enough.  Tr. 514.  This complaint regarding the ineffectiveness of her medication comports with her August 16, 2009 emergency room visit, where Zerbe complained that none of her medications, including Ms-Contin, Oxycodone, Gabapentin, and Cymbalta, were providing any relief.  Tr. 519.

diagnosis of a "herniated disc, spine injury, spinal cord injury, and spinal cord compression."  Tr. 498.

On September 15, 2009, Zerbe presented to Dr. Andreychik for a surgery evaluation.  Tr. 289.  Dr. Andreychik was reluctant to proceed with surgery since Zerbe was a very young individual; he believed it would be best to continue with conservative treatments and reevaluate Zerbe after a visit to the pain clinic.  Id. However, Dr. Andreychik ordered a discogram[9] as a precursor to any potential surgery.  Id.

On Dr. Andreychik's referral, Zerbe visited Dr. Ahmed at the pain clinic on October 12, 2009.[10]  Tr. 310.  Since previous epidural injections had failed, Zerbe refused further injections and requested surgery to correct her impairments.  Id. Unfortunately, surgery was not an option at that time; the only facility within the medical network that could perform a discogram would not accept Zerbe as a patient because she was an MRSA carrier.  Id.  At an October 25, 2009 emergency room visit, Zerbe again complained that her medications were not adequately controlling her back pain.  Tr. 488.

---

[9] "A discogram, or diskogram, is a test used to evaluate back pain . . . During a discogram, dye is injected into the soft center of the disk. The injection itself sometimes reproduces your back pain. Several disks may be injected, to try to pinpoint the cause of your back pain." Mayoclinic.com, Discogram Definition, *available at* http://www.mayoclinic.org/tests-procedures/discogram/basics/definition/prc-20013848 (last visited June 24, 2014).
[10] Prior thereto, on October 9, 2009, Zerbe was given a prescription for a cane to assist in her ambulation.  Tr. 495, 580.

On November 13, 2009, Gerald Gryczko, M.D., a state agency medical consultant, completed a physical residual functional capacity assessment.  Tr. 571-76.  Dr. Gryczko opined that Zerbe was capable of lifting or carrying up to twenty pounds occasionally and up to ten pounds frequently.  Tr. 571.  Zerbe could stand, walk, or sit for up to six hours per day, and was not limited in her ability to push or pull.  Id.  Dr. Gryczko believed that Zerbe should only occasionally balance, stoop, kneel, crouch, crawl, or climb ramps and stairs, though he believed that Zerbe should never climb ladders, ropes, or scaffolds.  Tr. 572.  Dr. Gryczko opined that Zerbe should avoid concentrated exposure to hazards such as heights or moving machinery, but otherwise was not limited in any way.  Tr. 572-73.

On December 15, 2009, Dr. Kemberling opined that Zerbe was "totally incapacitated" due to her back pain and "most likely may be permanently disabled."  Tr. 577.  Two weeks later, Dr. Kemberling clarified his views when he submitted a physical residual functional capacity assessment.  Tr. 660-61.  Dr. Kemberling believed that Zerbe could occasionally lift up to ten pounds but could only frequently lift up to five pounds.  Tr. 660.  He believed that Zerbe could only stand or walk for two hours in a workday, and could only sit for four hours.  Id.  Furthermore, Dr. Kemberling opined that Zerbe could only stand or walk for thirty minutes before requiring a rest; she then needed to sit for more than one hour before she could stand or walk again.  Id.  He also stated that Zerbe required up to

12

twelve breaks during a typical workday.  Id.  Dr. Kemberling noted that Zerbe

required the use of cane to ambulate.  Id.

Dr. Kemberling believed that Zerbe must completely avoid twisting,

crouching, stooping, squatting, or climbing, and must avoid all exposure to

extreme cold.  Id.  He further opined that Zerbe could only push or pull with any

extremities for twenty percent of the day, and could only use her arms in front of

her body for fifty percent of the day.  Tr. 661.  Dr. Kemberling also believed that

Zerbe's impairments would cause her to miss work or leave work early more than

two times per month.  Id.

On January 3, 2010 Zerbe returned to the emergency room complaining of

neck and back pain.  Tr. 676.  Zerbe complained that her pain medications were

"not doing a whole lot" to control her pain.  Id.  At this visit, Zerbe was again

diagnosed with a "herniated disc, spine injury, spinal cord injury and spinal cord

compression." Tr. 677. [11] On February 8, 2010, a CT scan of Zerbe's cervical

spine revealed mild degenerative changes in the lower cervical spine.  Tr. 668.

Finally, in April 2010 Zerbe presented to Ayman Bishay, M.D. and Andrew

Matrangrano, M.D. for a sleep evaluation.  Tr. 614.  Dr. Bishay diagnosed Zerbe

with insomnia, hypersomnia, and mild sleep apnea; he opined that Zerbe's

---

[11] Zerbe also presented to the emergency room on January 6, 2010 and March 6, 2010.  Tr. 669,
673.  At the March 6, 2010 visit, doctors noted that Zerbe was still carrying MRSA, and
therefore a discogram could not be performed.  Tr. 669.  At this appointment, Zerbe required a
cane at her bedside to assist her with ambulation.  Id.

medications likely contributed, at least partially, to her excessive daytime sleepiness.  Tr. 620, 632.  Dr. Bishay advised Zerbe to change from Lexapro to Wellbutrin to help alleviate some of her daytime sleepiness.  Tr. 640.

### C.    The Administrative Hearing

On January 11, 2011, Zerbe's administrative hearing was conducted.  Tr. 27-49.  At that hearing, Zerbe testified that she drove once or twice per week for no more than ten miles.  Tr. 30.  Zerbe stated that her back and knee pain, and the drowsiness that accompanied her pain medication, forced her to stop working.  Tr. 31, 39.  She testified that her back pain had grown progressively worse over the years and occasionally spread to her legs, arms, and hands.  Tr. 31-32.  Even with medication, Zerbe testified that her pain was usually a six or seven on a scale from one to ten.  Tr. 33.  She also stated that she was still experiencing a great deal of depression and anxiety, and would "cry a lot."  Tr. 33-34.  Zerbe stated that her medication caused significant drowsiness such that, even after sleeping until twelve p.m., she took two or three naps per day.  Tr. 39.

Zerbe testified that she can no longer bowl or go for long walks due to her impairments.  Tr. 33.  Zerbe stated that she enjoyed reading, but would fall asleep after approximately thirty minutes.  Tr. 35, 40.  Zerbe could only occasionally go shopping and, when she did shop, she had to take breaks, sit down, and limit the duration of her trip.  Tr. 35.  Zerbe stated that she would wake up at seven o'clock

in the morning and get her children a bowl of cereal for breakfast.  Id.  After the

children went to school, Zerbe would go back to sleep until around twelve p.m.

Id., tr. 39.  Zerbe was able to use a computer for fifteen to twenty minutes before

she would fall asleep, and would watch television during the day.  Tr. 36.  .  Zerbe

helped her children with their homework, but Zerbe's grandmother needed to help

her "with a lot of the housework."  Tr. 36.

Zerbe stated that, on a good day, she could walk for about thirty minutes at a

time, but on bad days she had trouble even getting out of bed.  Tr. 37.  Zerbe had

about three good days per week.  Id.  She could stand for about fifteen minutes at a

time, and could sit for thirty minutes to an hour at a time.  Id.  Zerbe testified that,

on the car ride to the administrative hearing, she had to stop twice to get out of the

car; each break lasted ten to fifteen minutes.  Tr. 38.

After Zerbe testified, Jody Doherty, an impartial vocational expert, was

called to give testimony.[12]  Tr. 41-47.  The ALJ asked Ms. Doherty to assume a

hypothetical individual with Zerbe's age, education, and work experience that was

limited to light work[13] and must be afforded the option to sit or stand at will.  Tr.

---

[12] During this testimony, Zerbe could no longer sit due to her back pain and needed to stand up.
Tr. 42.

[13] Light Work is defined by the regulations of the Social Security Administration as work "with
frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted
may be very little, a job is in this category when it requires a good deal of walking or standing, or
when it involves sitting most of the time with some pushing and pulling of arm or leg controls.
To be considered capable of performing a full or wide range of light work, you must have the
ability to do substantially all of these activities. If someone can do light work, we determine that

42-44.  Furthermore, the hypothetical individual could only occasionally balance, stoop, kneel, crouch, crawl, kneel, and climb stairs or ramps, but could never climb ladders, ropes, or scaffolds.  Tr. 42.  This individual could not push or pull with either her upper or lower extremities and would need to avoid hazards such as unprotected heights or machinery.  Id.  The hypothetical individual was also limited to simple, routine tasks.  Id.

Ms. Doherty opined that, given these restrictions, the hypothetical individual would not be able to perform any of Zerbe's past relevant work.  Tr. 42-43. However, Ms. Doherty testified that the individual would be capable of performing three jobs that existed in significant numbers in the national economy: a cashier, a ticket taker, and an information clerk.  Tr. 43.  Ms. Doherty stated that if the individual were off task for more than twenty percent of the day, missed more than two days of work per month, needed naps two to three times per day, or required up to twelve breaks per day, she would be unemployable.  Tr. 45-46.

## Discussion

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or

---

he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008).

Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. See 20 C.F.R. § 404.1520.  The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason, 994 F.2d at 1064.

### A.    The ALJ's Evaluation of Opinion Evidence

On appeal, Zerbe challenges the ALJ's evaluation of the opinion evidence. Specifically, Zerbe contends that the ALJ improperly rejected the opinion of her treating physician, Dr. Kemberling.

The preference for the treating physician's opinion has been recognized by the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).   When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. at 317, quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999).  In choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Morales, 225 F.3d at 317-18.

In evaluating Zerbe's mental impairments, the ALJ considered Dr. Kemberling's mental residual functional capacity assessment, but rejected the opinion outright.  Tr. 14.  The ALJ reasoned that she could not give any amount of weight to Dr. Kemberling's opinion because it was not consistent with the medical record and because Dr. Kemberling did not refer Zerbe "for any type of formal treatment or counseling." Id.

Neither of the reasons given by the ALJ for rejecting Dr. Kemberling's opinion constituted contradictory medical evidence, and the ALJ was unable to cite to any evidence or opinion that contradicted Dr. Kemberling's opinion.  The first reason proffered by the ALJ, the fact that Dr. Kemberling's opinion was "not

consistent with the documentary record," was the ALJ's lay opinion and cannot form a basis for rejecting a treating physician's opinion.  The second reason given by the ALJ, the fact that Dr. Kemberling had never referred Zerbe for outpatient treatment, was erroneous; Dr. Kemberling did in fact refer Zerbe for psychological therapy.  Tr. 485.  Without any contradictory medical evidence, the ALJ's decision to reject Dr. Kemberling's opinion outright constituted clear legal error.  Morales, 225 F.3d at 317.

The ALJ's decision to reject Dr. Kemberling's opinion created an additional issue; the ALJ was forced to reach a residual functional capacity determination without the benefit of any medical opinion addressing Zerbe's mental impairments.  Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.  See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir.1986) ("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence.").  See also, Arnold v. Colvin, 3:12-CV-02417, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014); Gormont v. Astrue, 3:11-CV-02145, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013); Troshak v. Astrue, 4:11-CV-00872, 2012 WL 4472024, at *7 (M.D. Pa. Sept. 26, 2012).

Dr. Kemberling opined that Zerbe's mental impairments resulted in some severe limitations, particularly with her ability to maintain pace and complete a workday or workweek without interruption.  Tr. 659-59.  The ALJ decided, without the benefit of any medical opinion, that Zerbe had no more than mild limitations in any of her functional abilities, and did not incorporate a single accommodation for Zerbe's mental impairments in the residual functional capacity determination.  Tr. 14, 18.  Consequently, the ALJ erred in disregarding Dr. Kemberling's opinion and reach a residual functional capacity determination without the benefit of any medical assessment.

### B.    Evaluation of Third Party Statements

Zerbe further contends that the ALJ erred in failing to consider two third party statements offered on behalf of Zerbe.  The Commissioner in turn argues that the ALJ thoroughly analyzed the evidence of record and, if any error occurred, it was harmless.  Ordinarily, an ALJ's failure to consider third party statements constitutes reversible error.  See, Burnett v. Comm'r of Soc. Sec., 330 F.3d 112, 122 (3d Cir. 2000).

Maria Bilger, Zerbe's grandmother, and Timothy Zerbe, Zerbe's husband, both submitted third party statements.  Tr. 157, 159.  Ms. Bilger wrote that Zerbe must use a cane and rest if she stood or walked for "too long."  Tr. 157.  Ms. Bilger stated that, due to her impairments, Zerbe needed help raising her children and

doing household chores.  Id.  Ms. Bilger also stated that medications made Zerbe

"very sleepy" and interfered with her ability to watch her children.  Id.  Mr. Zerbe

discussed the slow physical deterioration caused by Zerbe's impairments.  Tr. 159.

He twice discussed Zerbe's need to use a "cane every day" and her inability to stay

seated or standing for long periods of time.  Tr. 159-60.  Mr. Zerbe wrote of the

difficulties Zerbe had in caring for their children and doing household chores; he

wrote that Zerbe required help from both himself and Zerbe's grandmother to

complete even basic household tasks.  Tr. 159.

The third party statements of Ms. Bilge and Mr. Zerbe discussed several

important issues, including the side effects caused by Zerbe's medications, her

inability to sit or stand for any significant length of time, and Zerbe's need to use a

cane for ambulation.  Tr. 157, 159-60.  These statements were colorably probative

as they bolstered Zerbe's credibility and offered insights into her physical

limitations.  The ALJ was required to "address the testimony of such additional

witnesses," and erred in failing to do so.  Burnett, 220 F.3d at 122.

Contrary to the Commissioner's argument, the ALJ did not analyze all of the

relevant evidence contained within the administrative record, and the ALJ's

decision was therefore not supported by the record as a whole.  The ALJ's decision

did not analyze, or even reference, the diagnosis of a herniated disc and spinal cord

compression that was offered by multiple doctors.  Tr. 498, 512, 515, 677.  Such a

severe injury could well account for much of Zerbe's pain.  Thus, the cases cited by the Commissioner where the ALJ sufficiently addressed all of the relevant medical evidence, such as <u>Hur v. Barnhart</u>, 94 F.App'x 130 (3d Cir. 2004), are not applicable in this case.

Furthermore, the ALJ's error was not harmless as the Commissioner argues. The Commissioner points out that Zerbe's testimony covered all of the issues discussed in the third party statements.  The Commissioner further points out that the ALJ found Zerbe's testimony less than credible based on the medical evidence and Zerbe's activities of daily living.  Therefore, the Commissioner argues, the ALJ would have discredited the third party statements for the same reasons. However, the ALJ's credibility assessment of Zerbe was flawed[14] by her failure to mention significant physical impairments such as a herniated disc and spinal cord compression.  Tr. 498, 512, 515, 677.

The failure of the ALJ to find these impairments as medically determinable impairments, or to give an adequate explanation for discounting them, draws into question the ALJ's assessment of Zerbe's credibility.  <u>See, e.g.</u>, <u>Shannon v. Astrue</u>, 4:11-CV-00289, 2012 WL 1205816, at *10 (M.D.Pa. April 11, 2012); <u>Bell v. Colvin</u>, 3:12-CV-00634, 2013 WL 6835408, at *8 (M.D.Pa. Dec. 23, 2013); <u>Stape</u>

---

[14] Zerbe does not argue that the ALJ erred in her credibility analysis of Zerbe.  Consequently, this error cannot form the basis of a remand; however, this error is critical in analyzing the Commissioner's harmless error argument.

v. Colvin, Civil No. 3:13-CV-02308, 2014 WL 1452977, at *6 (M.D.Pa. April 14, 2014); Russell-Harvey v. Colvin, 3:12-CV-00953, 2014 WL 2459681, at *9-10 (M.D.Pa. May 29, 2014). The ALJ found that Zerbe's medically determinable impairments could reasonably cause her alleged symptoms but that her statements concerning the intensity, persistence and limiting effects of those symptoms were not credible. Tr. 17-18. This determination was based on an incomplete and faulty analysis of all of Zerbe's medically determinable impairments.

Consequently, even if the ALJ would have rejected the Ms. Bilge's and Mr. Zerbe's credibility for the same reasons that she used to reject Zerbe's credibility, such a determination would also have been improper. Therefore, on remand the ALJ must consider the third party statements offered by Ms. Bilge and Mr. Zerbe.

### C.    Physical Residual Functional Capacity Assessment

Finally, Zerbe challenges the ALJ's residual functional capacity determination inasmuch as it did not include Zerbe's need for a cane and did not accommodate the drowsiness caused by her medication. Zerbe argues that the hypothetical question posed to the vocational expert was flawed as a result of these errors, and the vocational expert's answers cannot constitute substantial evidence at step five of the sequential evaluation process.

Certain evidence established that Zerbe at least occasionally required the use of a cane for ambulation. On October 9, 2009, Mary Frances Koester, M.D.

prescribed Zerbe a cane to assist her in ambulating.  Tr. 580.  Dr. Kemberling

noted that Zerbe required a cane to walk and/or stand.  Tr. 660.  During a March

2010 emergency room visit, it was noted that Zerbe had a cane at her bedside.  Tr.

669.  Zerbe testified that she required a cane for ambulation; she also arrived at her

administrative hearing with her cane.  Tr. 43, 47.  Two different third party

statements confirmed that Zerbe used her cane to walk and stand.  Tr. 157, 159-60.

Evidence also supported Zerbe's propensity to fall, thereby necessitating the

use of a cane.  In late 2009, Zerbe presented to the emergency room three separate

times with back pain after falling down.  Tr. 488, 505, 519.  At several medical

appointments, fall precautions were put in place because Zerbe's physical

impairments placed her at an "increased risk of fall[ing.]"  Tr. 291, 312, 416, 423,

437.  To be certain, there was also contradictory evidence indicating that Zerbe

may not require an assistive device to ambulate.  For example, Zerbe was

consistently able to perform heel to toe walking, and often had a normal gait at her

medical appointments.  Tr. 183, 224, 260, 289, 492.  However, without even

referencing evidence that Zerbe required a cane for ambulation, this Court cannot

determine "if significant probative evidence was not credited or simply ignored"

and cannot meaningfully review the ALJ's decision.  Cotter v. Harris, 642 F.2d

700, 705 (3d Cir. 1981).  See also, Randall v. Astrue, 06-4431, 2007 WL 4530996,

at *3 (E.D. Pa. Dec. 20, 2007) ("The ALJ should have considered the medical

evidence concerning Plaintiff's use of an assistive device . . . The court has no way of knowing if the ALJ considered [this medical evidence] or simply ignored [it]; this lack of explicit consideration of potentially contradictory medical evidence undermines this court's ability to review the ALJ's decision.")

Furthermore, the ALJ did not properly consider the side effects of Zerbe's medications. Zerbe's medical records documented medication side effects, such as dizziness and drowsiness. Tr. 311, 423, 436, 620, 640. Dr. Kemberling opined that Zerbe would require up to twelve breaks per workday, and Dr. Bishay noted that Zerbe had "multiple sleep periods during the day and frequent short naps." Tr. 635, 660. Dr. Bishay further opined that Zerbe's medication was likely a contributing factor to her daytime sleepiness. Tr. 620. An emergency physician noted that Zerbe "appeared sleepy" and continually fell asleep while the physician was speaking with her. Tr. 509. Zerbe testified that her medications made her drowsy, and she needed to take two to three naps per day as a result. Tr. 39. In a third party statement, Ms. Bilger confirmed that Zerbe's medications made her drowsy. Tr. 157.

The ALJ did not reference any of this evidence, or provide any explanation for discounting it. The ALJ did note that Zerbe complained of drowsiness at her administrative hearing, and discounted Zerbe's credibility. Tr. 17-18. However, as discussed previously, the ALJ's credibility determination was flawed. Without

discussing other evidence that supported Zerbe's allegations of medication side effects, the ALJ's residual functional capacity determination and the subsequent questions posed to the vocational expert were flawed.  As a result, the vocational expert's testimony was compromised, and the ALJ's decision at step five of the sequential evaluation process was not supported by substantial evidence.

## Conclusion

A review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings consistent with this Memorandum and Order that follows.